J-S27017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.R.B. A/K/A D.B., MOTHER | : | |
| | : | No. 3120 EDA 2016 |

Appeal from the Decree August 30, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000076-2016,
FID#: 51-FN-004353-2013

BEFORE:   GANTMAN, P.J., OTT, and PLATT[*], JJ.

MEMORANDUM BY OTT, J.:                      **FILED MAY 09, 2017**

D.R.B. a/k/a D.B. ("Mother") appeals from the decree entered August 30, 2016, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated her parental rights to her minor daughter, A.M.N. ("Child"), born in January 2011.[1]  After careful review, we affirm.

The trial court summarized the relevant factual and procedural history of this matter as follows.

The family in this case became known to [the Philadelphia Department of Human Services ("DHS")] on September 5, 2013,

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court entered a separate decree confirming the consent of Child's father, J.S.N., and terminating his parental rights on August 29, 2016. J.S.N. did not file a brief in connection with this appeal, nor did he file his own separate appeal.

when DHS received information that Mother and Child were the subject of a Child Protective Services investigation for neglect, begun in the state of New Jersey. Mother and Child had relocated to Philadelphia, outside the reach of New Jersey's Children and Youth Agency. On September 13, 2013, DHS received a report that there was drug activity in Mother's home. On November 13, 2013, Mother tested positive for opiates on a drug screen. DHS implemented In-Home Protective Services in Mother's home. On February 4, 2014, the court adjudicated Child dependent, ordering DHS to supervise Child in the home of her paternal great-grandparents. These great-grandparents permitted Mother to visit Child without supervision, in violation of the court's order. DHS then obtained an Order of Protective Custody, removed Child and placed her in foster care.[2] Child was fully committed to DHS custody at a March 20, 2014, hearing. The case was then transferred to a Community Umbrella Agency ("CUA"), which developed a Single Case Plan ("SCP") with objectives for Mother. Following a number of negative drug screens, the court changed Mother's visits to unsupervised on July 1, 2014. On September 29, 2014, DHS received a report that Child had been sexually abused by Mother's boyfriend during an unsupervised visit with Mother. Mother's visits were changed to supervised. Over the course of 2014 and 2015, Mother failed to engage in mental health treatment as required by her SCP and court orders. On January 28, 2016, DHS filed a petition to terminate Mother's parental rights.

Trial Court Opinion, 11/28/2016, at 1-2.

_____

[2] Child later returned to the care of her paternal great-grandparents. DHS Exhibit 2 (Shelter Care Order dated March 20, 2014) ("Child to be [r]eunified with Paternal Great[-]Grandparents today."). Although the details are not clear from the record, Child was removed from the care of her paternal great-grandparents for a second time in or after December 2014, and placed in the care of her paternal grandmother. *See id.* (Permanency Review Order dated March 3, 2015); N.T., 8/17/2016, at 99-100. Child then was removed from the care of her paternal grandmother on the first day of the termination hearing, May 27, 2016. N.T., 5/27/2016, at 88. Child currently resides with an unrelated foster family. N.T., 8/17/2016, at 9.

The trial court conducted a termination hearing on May 27, 2016, August 17, 2016, August 29, 2016, and August 30, 2016. Following the hearing, the court entered a decree involuntarily terminating Mother's parental rights to Child. Mother timely filed a notice of appeal on September 29, 2016, along with a concise statement of errors complained of on appeal.

Mother now raises the following issues for our review:

[1]. Whether the trial court erred in terminating Mother's parental rights by sua sponte relying upon its own interpretation of negative drug testing results and purported evidence of Mother's drug use, preventing reunification of Mother with her child and from achieving her drug and alcohol individual service plan objective in a timely manner?

[2]. Whether the trial court erred in permitting William Russel[l], Ph.D., a psychologist, to offer a medical opinion as to the manner in which the child contracted chlamydia while in a court[-]ordered kinship care placement?

[3]. Whether the trial court erred in not allowing Mother to call fact witnesses named in her pre-trial submission?

[4]. Whether the trial court's ruling to terminate Mother's parental rights was not supported by clear and convincing evidence establishing grounds for involuntarily termination?

Mother's brief at 2 (unnecessary capitalization omitted).

We consider these claims mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest

- 3 -

unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

In her first issue, Mother argues that the trial court erred by *sua sponte* "relying upon its own interpretation of negative drug testing results and purported evidence of Mother's drug use[.]" Mother's brief at 9 (unnecessary capitalization omitted). Mother initially focuses on Child's adjudication of dependency, which she argues was not supported by clear and convincing evidence. *Id.* at 9-10. Mother argues that the court adjudicated Child dependent based on its unsupported belief that Mother was continuing to use drugs after 2013, and that the court later relied on this belief to prevent Mother from being reunified with Child and to terminate Mother's parental rights. *Id.* at 9-11. Specifically, Mother contends that the court concluded without expert testimony that her drug screens revealed abnormal creatinine levels, and that this indicated that Mother was diluting her urine in order to avoid a positive drug test. *Id.*

The trial court addressed this issue in its opinion pursuant to Pa.R.A.P. 1925(a) as follows.

> Mother's second issue on appeal alleges that the trial court found, on the basis of improper inferences, that Mother was masking drug use by diluting her urine. There was no testimony

as to the interpretation of any drug screens submitted by Mother or the [Clinical Evaluation Unit ("CEU")], except as to the services provided to Mother and her attendance for drug screens in compliance with court orders and whether the results were negative or positive. Because the trial court did not make the finding which Mother now appeals, there can be no possibility of error or abuse of discretion.

Trial Court Opinion, 11/28/2016, at 9.

Mother's claim fails. To the extent Mother is attempting to challenge Child's initial adjudication of dependency, the time to appeal that order has passed. Whether clear and convincing evidence supported Child's adjudication of dependency in 2014 has no bearing on whether clear and convincing evidence supports the termination of Mother's parental rights now. Further, the record refutes Mother's claim that the trial court terminated her parental rights based on its belief that she was continuing to use drugs. Our review of the record reveals that the court mentioned Mother's creatinine levels only once during the termination hearing. On the first day of the hearing, May 27, 2016, Mother's counsel indicated that he intended call a witness who would testify concerning "certain interpretations of drug testing in this case[.]" N.T., 5/27/2016, at 34. When the court asked what the relevance of that testimony would be, the following discussion took place.

> [Mother's counsel]: . . . [M]other's been coming before this Court now for two years providing you with reports saying she attended D[rug] and A[lcohol] and producing negative screens and this Court has continually told her based upon your interpretation of the chemical analysis, you believe she was still using whether it was for creatine [*sic*] levels or trace amounts of controlled substance.

- 5 -

THE COURT: The last report that I have on the case from the CEU, and I don't know if mom has gone since then, is September 30, 2015. Mom's creatine [*sic*] level was 154.86. It's normal and she was negative so I'm not sure where you're going with that.

[Mother's counsel]: Well –

THE COURT: Now mom, at some point early on, she did have creatine [*sic*] levels below 100 which is consider[ed] to be abnormal.

[Mother's counsel]: And because of that, reunification with the mother, that's one of the reasons, reunification with the mother was denied.

THE COURT: That's incorrect.

[Mother's counsel]: And what I'm saying is that put her at a disadvantage to get her child back.

THE COURT: That's incorrect. Reunification was never denied to mom because mom has to be fully compliant or successfully completed her objectives and I don't believe -- up until the last full review, mom was not fully compliant. Mom was substantially compliant.

[Mother's counsel]: With all due respect, I believe that Your Honor found her for example not to be in compliance with her objectives because you determined that her creatine [*sic*] level indicated that she was masking.

THE COURT: Well I told you the last one I have is 09/30/2015 –

[Mother's counsel]: And she's compliant.

THE COURT: And she was fine then she had another one on 06/02/2015 and it was negative and 135 so it's abnormal. So I'm not sure where you're coming from so I don't see the relevancy . . . .

N.T., 5/27/2016, at 36-37.

Thus, at best, the trial court indicated that Mother had abnormal creatinine levels during a drug screen about a year prior to the termination hearing. The court did not indicate on the record or in its opinion that it believed Mother was continuing to use drugs, nor did it rely on any alleged drug use in order to terminate Mother's parental rights. Because we agree with the court that it did not make the finding that Mother is attempting to challenge on appeal, no relief is due.

Next, Mother argues that the trial court erred by permitting Dr. Russell to offer a medical opinion "as to the manner in which the child contracted chlamydia[.]" Mother's brief at 11 (unnecessary capitalization omitted). In this issue, Mother challenges the court's finding that Child was sexually abused by her boyfriend. Mother contends that her unsupervised visits with Child were ended after Child contracted chlamydia the first time. *Id.* However, Mother contends that Child contracted chlamydia again after her unsupervised visits were ended, which demonstrates that she "could not factually be responsible[.]" *Id.* Mother argues that the court improperly permitted Dr. Russell to offer "what amounted to wild speculation" as to how Mother may have been responsible for Child contracting chlamydia a second time. *Id.* at 11-12.

Our standard of review when addressing the admissibility of evidence is well-settled.

> Admission of evidence is within the sound discretion of the trial
> court and a trial court's rulings on the admission of evidence will

not be overturned absent an abuse of discretion or misapplication of law. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

***Schuenemann v. Dreemz***, ***LLC***, 34 A.3d 94, 100-01 (Pa. Super. 2011)

(quotations and citations omitted).

The admission of expert testimony is governed by Rule 702 of the Pennsylvania Rules of Evidence. Rule 702 provides as follows.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

It is well established in this Commonwealth that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. It is also well established that a witness may be qualified to render an expert opinion based on training and experience. Formal education on the subject matter of the testimony is not required, . . . . It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise

within the ordinary range of training, knowledge, intelligence or experience.

***Miller v. Brass Rail Tavern, Inc.***, 664 A.2d 525, 528 (Pa. 1995) (citations and emphasis omitted).

Mother's argument stems from Dr. Russell's recommendation that she receive a polygraph examination in order to asses her knowledge of and/or involvement with the sexual abuse suffered by Child. ***See*** N.T., 8/17/2016, at 34. On cross-examination, counsel for Mother asked Dr. Russell if he would change his recommendation if he "found out, [] that this child contracted chlamydia a second time[.]" ***Id.*** at 45. Dr. Russell attempted to respond to counsel's question by stating, "The biggest problem with that whole logic there is the disease itself, chlamydia." ***Id.*** Counsel for mother objected to Dr. Russell's response on the basis that he is not a medical doctor, and Dr. Russell did not provide any further explanation. ***Id.*** at 45-46.

Later, on redirect examination, counsel for DHS asked Dr. Russell, "What is your understanding of how chlamydia is displayed in females?" ***Id.*** at 61. Counsel for Mother again objected on the basis that Dr. Russell is not a medical doctor, and the trial court overruled the objection. ***Id.*** Dr. Russell then provided the following explanation.

> There is vast research given that chlamydia is the number one sexually transmitted disease in this country right now. Regarding the testing for it and transmission of it and the manifestation of it. . . .

*** 

Based on the extensive research due to the disease we know that an individual can be exposed to chlamydia and show absolutely no signs of that disease for up to periods of two, three years. Or the same thing you can have is you can have someone who's positive for the disease and show no signs of it.

The issue we have here is we have chlamydia. We know that there's a sexually transmitted disease. How and when specifically it occurred, we simply can't answer. We know that it occurred. We know what the medical reports from the hospital state. "Presence of sexually transmitted disease and vaginal tearing."

The child was abused the question is using the chlamydia discover date a[s] the date of the abuse you just can't do. You have no idea when that child was exposed to it. Much as, counsel pointed out [] a second case of chlamydia, you have no idea when that was exposed because of the lag time between exposure and manifestation of the symptomology.

*Id.* at 62-63. Dr. Russell agreed that a person can be treated for chlamydia and then test positive for the disease again without being re-infected. *Id.* at 63-64.

In its opinion, the trial court found that Dr. Russell was qualified to offer expert testimony regarding how chlamydia is displayed in females. The court explained that Dr. Russell has knowledge regarding this issue beyond that of an average layperson, because "Dr. Russell's practice routinely involves him in cases where children have been sexually abused. As a result, Dr. Russell has specialized knowledge of how sexually transmitted diseases such as chlamydia can be acquired." Trial Court Opinion, 11/28/2016, at 10. The court noted that it gave Dr. Russell's testimony on

- 10 -

this issue little weight, and instead focused on Dr. Russell's testimony that Mother minimized Child's sexual abuse. ***Id.***

At the outset, it is clear that Dr. Russell did not offer an opinion "as to the manner in which the child contracted chlamydia," as Mother argues in her brief. Mother's brief at 11 (unnecessary capitalization omitted). To the contrary, Dr. Russell testified repeatedly that he did not know how Child contracted chlamydia. ***See, e.g.,*** N.T., 8/17/2016, at 52 ("We have no idea who's responsible, who participated in, who knew of a young girl being sexually abused."). Dr. Russell merely explained that it is impossible to pinpoint when Child contracted chlamydia based on the onset of her symptoms. Because Dr. Russell did not offer the testimony that Mother is attempting to challenge on appeal, she is not entitled to relief.

In addition, we agree with the trial court that Dr. Russell was qualified to provide expert testimony concerning the way chlamydia is displayed in females. Dr. Russell's testimony indicates that he is familiar with the "vast research" that exists regarding chlamydia. Thus, the record supports the court's finding that Dr. Russell possessed knowledge beyond that of an average layperson. ***See*** Pa.R.E. 702; ***Miller***, 664 A.2d at 528.

Mother's third issue is that the trial court erred by not allowing her to call Child's maternal grandfather as a witness during the termination hearing. Mother's brief at 12. Mother argues that Child's maternal grandfather would testify that she lived with him during the dependency

- 11 -

proceedings, and that he never observed her using drugs. ***Id.*** According to Mother, this testimony would "contradict, directly the allegation of DHS that [M]other was continuing to use drugs after child was removed from her custody." ***Id.***

During the termination hearing, the trial court asked Mother's counsel for an offer of proof as to why he wished to call Child's maternal grandfather as a witness. N.T., 5/27/2016, at 19. Counsel for Mother explained that Child's maternal grandfather would testify that he never observed Mother using drugs, and the court concluded that this testimony would not be relevant to the proceedings. ***Id.*** at 19-21. The court explained, "[M]other was given objectives, one of them being D[rug] and A[lcohol]. The relevancy is whether [M]other had successfully completed her D[rug] and A[lcohol] program. That's the relevancy. So maternal grandfather, [T.B.], is denied. He will not be able to testify." ***Id.*** at 21.

In its opinion, the trial court addressed this issue as follows.

> Mother also alleges that it was error for the trial court to preclude T.B., Child's maternal grandfather, from testifying. At the May 27, 2016[] hearing, the trial court requested an offer of proof establishing what relevant testimony this witness would provide. Mother's counsel indicated that T.B. would testify that he had lived with Mother and had never seen her use drugs. However, DHS's case in support of its petition to involuntarily terminate Mother's parental rights would focus on whether Mother failed or refused to perform parental duties, comply with court orders and successfully complete her objectives. Mother admitted to selling drugs in New Jersey. DHS also intended to argue that Mother had unreasonably delayed engaging in court-ordered treatments. Since T.B.'s testimony would only pertain to Mother's character and not Mother's ability to parent Child,

- 12 -

T.B. would only offer irrelevant testimony. The trial court properly precluded him from testifying.

Trial Court Opinion, 11/28/2016, at 8 (citations to the record omitted).

We discern no abuse of discretion. After careful review of the record, we agree with the trial court that Child's maternal grandfather was not a relevant witness in these proceedings. Critically, DHS did not allege in its termination petition that Mother was continuing to use drugs, none of the witnesses presented by DHS during the termination hearing testified that Mother was continuing to use drugs, and the court did not make a finding that Mother was continuing to use drugs. Under these circumstances, the maternal grandfather's testimony had no bearing on whether Mother's parental rights should be terminated, and it was proper for the court to disallow Mother's counsel from calling him as a witness.

In her final issue, Mother contends that DHS failed to present clear and convincing evidence in support of its petition to involuntarily terminate her parental rights. Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the

- 13 -

emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). This Court need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we will analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

- 14 -

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the trial court found that Mother is incapable of parenting Child, and will not be able to remedy that incapacity. Trial Court Opinion, 11/28/2016, at 16. The court found that Mother failed to complete her SCP objectives, as she did not obtain mental health treatment. *Id.* at 15-16. The court further found that Mother took an unreasonably long period of time to address those objectives that she did complete. *Id.* The court emphasized that Mother minimized the seriousness of the sexual abuse

- 15 -

suffered by Child, and made little effort to involve herself in Child's trauma therapy. *Id.* at 15-16.

In response, Mother argues that she completed her SCP objectives by remedying her drug and alcohol issues, completing parenting classes, maintaining employment, obtaining her GED, and attending her visits with Child. Mother's brief at 13-15. Mother further argues that she does not suffer from mental health issues. *Id.* at 14-15. Mother contends that she "was only prohibited from reunifying with her child because it was thought and believed her child had been abused by her omission, of which there was no proof whatsoever." *Id.* at 15.

Our review of the record supports the trial court's findings. During the termination hearing, DHS presented the testimony of former CUA case manager, Javette Clayton, who was assigned to this matter from March 2014 until the end of May 2016. N.T., 8/17/2016, at 74, 86. Ms. Clayton testified that Mother's SCP objectives included obtaining mental health treatment, recovering from substance abuse, improving her relationship with Child, visiting with Child, attending computer job training, obtaining her GED, maintaining employment, and attending the Achieving Reunification Center ("ARC"). *Id.* at 75.

Ms. Clayton further testified that Mother completed the majority of these objectives. Mother initially attended substance abuse treatment at the WEDGE, but was discharged in June 2015 due to noncompliance. *Id.* at 76-

80. Mother then attended substance abuse treatment at the NET, which she completed successfully in October 2015. *Id.* at 80. Mother never tested positive for illegal substances while Ms. Clayton was assigned to this case. *Id.* at 107. Mother participated in housing and financial workshops at ARC, completed job training, and maintained employment. *Id.* at 107-08. Mother also completed a parenting program in April 2015. *Id.* at 87.

However, Ms. Clayton testified that Mother did not complete all of her SCP objectives, as she failed to obtain mental health treatment.[3] *Id.* at 110. Mother informed Ms. Clayton that she completed a psychological evaluation at the WEDGE, but she did not provide her with a copy of the evaluation. *Id.* at 88-89. Moreover, while Mother attended her visits with Child consistently, the visits were changed from unsupervised to supervised, due to the revelation in September 2014 that Child had been sexually abused and contracted chlamydia. *Id.* at 82, 97, 104. Ms. Clayton spoke with Child concerning this abuse, who informed her that she "was with mommy," and that "[m]ommy's boyfriend" touched her inappropriately.[4] *Id.* at 84. Child was diagnosed with chlamydia a second time in December 2014. *Id.* at 99.

---

[3] In addition, to the knowledge of Ms. Clayton, Mother did not obtain her GED. N.T., 8/17/2016, at 109.

[4] It is not clear from the record whether Mother and the boyfriend remain in a relationship.

DHS also presented the testimony of Child's therapist, Katherine Miller. Ms. Miller testified that she began providing therapy to Child in July 2015. N.T., 8/29/2016, at 14-15. Ms. Miller explained that Child reported three separate instances of abuse, perpetrated by Mother's boyfriend while Child was in Mother's care. *Id.* at 17, 50. According to Ms. Miller, Child "hasn't talked about the third instance but for the two instances that she's started to process, she does identify that mom was in the room or in the car at the time that the abuse happened." *Id.* at 18.

Ms. Miller further testified that it is extremely important that Child has a caregiver who participates in her trauma therapy. *Id.* at 21. She explained, "after the trauma narrative, the next phase of treatment is to do conjoint work with the identified caregiver . . . it's really important that that caregiver be appropriate as demonstrated by their ability to be fully believing and fully validating of the history of trauma[.]" *Id.* However, Ms. Miller reported that Mother has not participated in Child's therapy, and did not meet with her at all until earlier that day, August 29, 2016. *Id.* at 21. When Ms. Miller provided Mother with her contact information, Mother stated "[s]omething to the effect of, you know, thank you, I've been given this before several times and I'm always losing everything." *Id.* at 24-25. Ms. Miller reviewed Child's records, which indicated that Mother attended only a single meeting with Child's previous therapist in February 2015. *Id.* at 25.

In addition, DHS presented the testimony of psychologist, William Russell, Ph.D. Dr. Russell testified that he conducted a parenting capacity evaluation of Mother, and completed a report in November 2015. N.T., 8/17/2016, at 16. Regarding the sexual abuse suffered by Child, Dr. Russell reported that Mother "minimized" the abuse and simply blamed it on Child's paternal great-grandparents, with whom Child was placed at the time the abuse was discovered. *Id.* at 20-22. "There was no indication that [Mother] was looking to blame anybody or wanted to know any further where it was going. She was happy to simply say, 'It was the grandparents.'" *Id.* at 21-22. Dr. Russell expressed concern regarding Mother's "subsequent noninvolvement in the child's treatment, noninvolvement in trying to understand that emotional distress [that] a child of that age would have gone through, noninvolvement in understanding, 'What do I need to do to prepare myself to be able to address the needs of that child?'" *Id.* at 52.

Ultimately, Dr. Russell concluded that Mother lacked the capacity to provide Child with safety or permanency. *Id.* at 30. He explained this conclusion as follows, in relevant part.

> [Mother], at the time I saw her and based on the information she provided and the record, presented as a very immature, naïve young woman who was, as I described earlier, sort of leading the life of a single person, not taking any real responsibility for providing safety to a child or permanency to a child, not making any effort that was obvious or clear to us that she was attempting to find out what happened to her child or who was responsible for infl[i]cting the sexual abuse on the child.

- 19 -

> And then, there was little effort demonstrated at staying on top of what was happening with the child. As I said she wasn't familiar with the therapeutic process. You know the child had been in care for a year at that point, now two years, and it was just no evidence that [Mother] was investing any effort to rectify the situation.

*Id.* at 28-29. In order to address Mother's parenting deficits, Dr. Russell recommended that Mother attend individual therapy, participate in ongoing drug screens, and submit to a polygraph examination in order to asses her knowledge of and/or involvement with the sexual abuse suffered by Child. *Id.* at 33-34.

Thus, the record supports the trial court's decision to involuntarily terminate Mother's parental rights pursuant to Section 2511(a)(2). The court was free to accept Dr. Russell's opinion that Mother lacks the capacity to provide Child with safety or permanency. Most troubling is Mother's reaction to the sexual abuse suffered by Child. Mother minimized the seriousness of this abuse, and made little, if any, effort to involve herself in Child's treatment. The record suggests that Mother may even have been aware of this abuse and did nothing to stop it. Finally, Mother failed to obtain mental health treatment, despite years of opportunities, and despite Dr. Russell's recommendation that treatment was necessary.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have discussed our analysis pursuant to Section 2511(b) as follows.

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the trial court found that Child and Mother do not share a parent/child bond, and that Child instead views Mother as "a friend to have fun with." Trial Court Opinion, 11/28/2016, at 20. The court concluded that Child's relationship with Mother is not necessary or beneficial, and that

terminating Mother's parental rights would not cause Child to suffer irreparable harm.[5] *Id.* We agree.

The record supports the trial court's findings with respect to the relationship between Child and Mother. During the termination hearing, Ms. Clayton testified that Child and Mother do not share a parent/child bond. N.T., 8/17/2016, at 85. She described the relationship between Child and Mother as follows: "It was more so, it was as if [Child] was visiting with like a close friend she was out with and she looked up to. . . . Like someone she always liked to go out [with] and they would have fun together."[6] *Id.* Ms. Clayton did not believe that terminating Mother's parental rights would cause Child to suffer irreparable harm. *Id.* at 91. She explained, "[Child] . . . never said to me, 'I want to live with my mother,' not once since I've been on this case." *Id.*

In addition, as discussed above, the record establishes that Mother is incapable of providing Child with safety or permanency. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to

---

[5] Mother makes no effort to challenge the court's findings with respect to Section 2511(b) in her brief.

[6] Mother presented the testimony of her former visitation coach, Danielle Block, who observed Child's visits with Mother from March 2014 until August 2014. N.T., 8/30/2016, at 7. Ms. Block testified that Child and Mother appeared to share a "wonderful bond" during the visits that she observed. *Id.* at 14. The trial court rejected this testimony on the basis that Ms. Block had not seen Child and Mother together in two years. Trial Court Opinion, 11/28/2016, at 20.

attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Thus, it is clear that terminating Mother's parental rights will best serve Child's needs and welfare.

Based on the foregoing, we conclude that the trial court did not err or abuse its discretion, and we affirm the August 30, 2016 decree involuntarily terminating Mother's parental rights.

Decree affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/9/2017